IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

PATRICK BERNARD SMITH, #896428        §

VS.                                   §              CIVIL ACTION NO. 6:10cv243

ROBERT ROE, ET AL.                    §

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

    Plaintiff Patrick Bernard Smith, a prisoner previously confined at the Beto Unit of the Texas

prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil

rights lawsuit pursuant to 42 U.S.C. § 1983.   The complaint was transferred to the undersigned with

the consent of the parties pursuant to 28 U.S.C. § 636(c).

    The present Memorandum Opinion concerns Defendants' motion for summary judgment

(docket entry #208).  Plaintiff did not timely file a response.

History of the Case

    The original complaint was filed in the Southern District of Texas on April 3, 2009.  Plaintiff

filed an amended complaint (docket entry #5) on June 1, 2009.  He filed a second amended complaint

(docket entry #12) on August 27, 2009, which added claims about incidents that occurred at the Beto

Unit on March 16-17, 2009.  On May 5, 2010, Plaintiff's claims about matters that occurred at the

Beto Unit were severed from the lawsuit and transferred to this Court.  On August 5, 2010, the Court

conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir.

1985), to consider Plaintiff's claims.  Defendants were then ordered to respond to Plaintiff's claims.

1

On October 18, 2010, Defendants filed a motion for summary judgment limited to the defense of exhaustion of administrative remedies (docket entry #132).  In response, Plaintiff asserted that he had exhausted his administrative remedies by the time he filed his second amended complaint, which included the claims that are the subject of this lawsuit.  On November 1, 2010, the Court granted the motion for summary judgment, and the case was dismissed.  It was noted that Plaintiff filed the lawsuit before he exhausted his administrative remedies, which violated the basic mandate of the Prison Litigation Reform Act ("PLRA") that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Plaintiff appealed the dismissal of the lawsuit.  In analyzing the exhaustion issue, the Fifth Circuit noted that the PLRA plainly requires that administrative remedies be exhausted before the filing of a § 1983 lawsuit.  *Smith v. Olsen*, 455 Fed. App. 513, 515 (5th Cir. 2011).  The Court went on to apply the exhaustion requirement to the facts of the present case as follows:

> Smith raised new factual allegations in his second amended complaint, also reflected in grievance #2009117825, that had not been raised in his initial or first amended complaint....  It is apparent that Smith intended his second amended complaint to raise new claims, which he had exhausted, and these claims were so unrelated to his original complaint that they ultimately became a separate lawsuit.  It is therefore in the interest of fairness that Smith, a pro se inmate, be allowed to proceed with the claims he exhausted pursuant to grievance # 2009117825 prior to the filing of his second amended complaint.

*Id.* at 516.  The judgment of this Court was accordingly reversed.

Defendants filed a motion for summary judgment (docket entry #208) on the merits of the case on May 25, 2012.  Plaintiff did not file a response by the deadline of June 20, 2012.

<u>Plaintiff's Factual Allegations</u>

Plaintiff's second amended complaint discussed his history of knee problems, which existed before he was transferred to the Beto Unit.  In late January 2009, a specialist analyzed the results of

2

a MRI and told him that he had a torn ligament, a torn tendon, a torn ACL, a torn MCL, and a fractured bone in his left knee. In mid-February 2009, a specialist referred him to another specialist to determine if his health would allow surgery. Plaintiff stated that he was transferred from the Hughes Unit to the Beto Unit in March 2009. The incidents which are the subject of the present lawsuit occurred on March 16-17, 2009. He asserted that he was being treated in the Beto Unit infirmary until he became involved in a dispute with Sgt. Olsen and Dr. Roe,[1] both of whom are defendants. Thereafter, he was placed in a cell, where he fell and reinjured his knee. He was taken back to the infirmary. Plaintiff alleged that the attending nurse refused to see him. Plaintiff refused to leave the infirmary and sat down on the floor. He complained that he was forcibly removed from the infirmary and taken to his cell, where he was flipped upside down to remove his leg irons. He alleged that he was subjected to deliberate indifference to his serious medical needs and excessive use of force.

### Defendants' Motion for Summary Judgment

The Defendants filed a motion for summary judgment (docket entry #208) on May 25, 2012. They denied that they were deliberately indifferent to Plaintiff's serious medical needs and subjected him to excessive use of force. They noted that the facts alleged arguably raised additional claims, which they likewise rejected. They argued that they are entitled to summary judgment based on qualified immunity. In support of their motion, they submitted affidavits from Defendants Dr. Robert Roe, Sgt. Michael Olsen, Nurse Donna Steely, Nurse Nancy Young,[2] Officer Eric McClendon and Officer Penelope Barnes. They also submitted affidavits from experts Dr. Steven Bowers and Nurse Tara Patton. They finally submitted copies of relevant medical records, a DVD of the incident,

---

[1]Plaintiff referred to Dr. Roe as a physician's assistant, but he is actually a doctor.

[2]Presently Nurse Nancy Walton

relevant pages from a use of force report, prison grievances and portions of the TDCJ Offender

Orientation Handbook.

Defendants' statement of undisputed material facts provided their own discussion of the facts

of this case. It was noted that Plaintiff injured his left knee while playing basketball on May 25, 2007.

He injured his right knee when he fell down stairs in August 2008. On February 22, 2009, he was

admitted to the Beto Unit infirmary regarding his injuries. On March 16, 2009, Plaintiff became very

disruptive by yelling and screaming and pounding on the windows of his room. As a result, security

was called, and Dr. Roe made the decision to discharge Plaintiff from the infirmary. Dr. Roe stated

in his affidavit that he made the decision to discharge Plaintiff for the following two reasons:

> First, there was no medical reason for Plaintiff to remain in the infirmary rather than in a cell.
> Plaintiff was in the infirmary to await further testing and medical appointments for his legs.
> The discharge plan was for Plaintiff to continue his medications as per current medical pass,
> await orthopedic disposition, and make sure that his orthopedic appointment for April 23,
> 2009, was kept, all of which could be accomplished in a cell. Second, I discharged Plaintiff
> due to his behavior. Plaintiff's actions in pounding on the windows could have caused further
> injury to Plaintiff, and the yelling, screaming and unruly behavior certainly would have upset
> other inmate patients in the infirmary who needed rest and quietness for their medical
> condition or illness. The discharge plan to a cell was appropriate in that Plaintiff required no
> medical attention in an infirmary setting. I believed that discharging Plaintiff from the
> infirmary on March 16, 2009, was the right decision to make and in the best interest of Plaintiff
> and my other inmate patients.

Plaintiff was thus placed in transient housing where nursing staff was available 24 hours a day, with

medical rounds at least once an hour. Dr. Stephen Bowers stated in his expert report that he reviewed

the medical records, which showed that Dr. Roe paid attention to Plaintiff's complaints and problems,

often in the face of resistance from Plaintiff, and that none of his acts showed that Dr. Roe "acted with

deliberate indifference to any medical condition and all acted reasonably within the scope of standard

medical practice."

4

Sgt. Michael Olsen stated in his affidavit that he did not recall the incident on March 16, 2009. He noted, however, that he never made a request nor urged Dr. Roe to discharge a patient from the infirmary.  As such, he would not have asked Dr. Roe to discharge Plaintiff or send him to the transient cell.  He added that it was his practice to advise a doctor when an inmate was causing a disruption, but only the doctor made any decision about discharging an inmate from the infirmary.  Sgt. Olsen noted that Plaintiff complained that he placed him in a transient cell with no operable lights.  He observed that his normal practice was to turn on the lights and check to see that everything in the cell was clean and operable before placing an inmate in an assigned cell.

The medical records reveal that Plaintiff was seen by Nurse McKnight a few hours later at 2:55 a.m. on March 17, 2009.  Plaintiff stated that he had fallen in his cell.  Nurse McKnight noted that Plaintiff had two crutches but stated that he could not walk.  Plaintiff indicated that the injury caused numbness to his left arm and hand.  Plaintiff was able to move all fingers and make a fist.  There was no swelling noted in his left arm or hand.  He did not complain about pain; instead, he complained only about numbness.  Nurse McKnight emailed Nurse Practitioner Melvin Wright for instructions.  She was told to schedule an appointment with a provider.  Plaintiff was given an appointment, but he was transferred to the Hughes Unit prior to the appointment.  He was transferred on March 19, 2009.

On March 17, 2009, at approximately 11:20 a.m., Defendant Officer Eric McClendon brought Plaintiff into the Beto Unit emergency room in a wheelchair.  McClendon stated in his affidavit that he and Defendant Officer DePalma escorted Plaintiff to the emergency room in a wheelchair for an appointment. He asked Defendant Nurse Donna Steely where to take Plaintiff.  Steely told McClendon that Plaintiff did not have an appointment and to take him back to his cell.  Defendant Nurse Nancy Young noted in her affidavit that she observed McClendon bring Plaintiff into the emergency room.

5

She also observed Nurse Shirley Huff inform McClendon that Plaintiff did not have an appointment and that he needed to be returned to his cell.

Plaintiff became angry when he was told that he did not have an appointment and needed to be taken back to his cell.  He got out of the wheelchair under his own power and began screaming that his legs were broken.  It is noted that the affiants used a number of different terms to describe how Plaintiff got out of the wheelchair.  Nurse Patton stated that Plaintiff "pushed" himself out of the wheelchair.  Nurse Steely stated that he "jumped" out of the wheelchair.  Nurse Young stated that he "threw himself to the floor."  A supervisor was called because Plaintiff was causing a disruption. Additional staff arrived, and orders were given to place Plaintiff on a gurney and to return him to his cell.

The DVD recorded all of the events that followed.  The video initially showed Plaintiff sitting on the floor in the infirmary.  The video, coupled with the affidavits, revealed that Officer McClendon endeavored to handcuff Plaintiff.  Officer Domenico DePalma, Officer Stacy Hinton, Officer Jesse Davis, Lt. Greg Vickery and Sgt. Kevin Carlvin attempted to place Plaintiff on the gurney.  Plaintiff persisted in struggling with them.  The video showed him kicking and screaming that his leg was broken.  The officers were eventually able to place him on the gurney and strap him down.  Nurse Young conducted a visual examination and noted no visible injuries.  She also noted that he was using his legs in his resistance to staff.  Defendant Officer Penelope Barnes noted in her affidavit that she observed Plaintiff try to bite Lt. Vickery and Officer Davis several times.  Because Nurse Young saw no signs of injuries during her visual examination and because Plaintiff refused to cooperate, he was taken out of the emergency room.  The video showed him still resisting as he was being rolled out of the emergency room on the gurney.

6

The video next showed Plaintiff being transported down the main hallway of the Beto Unit and then to his cell.  The officers picked up Plaintiff and placed him on the floor in his cell.  Officer Barnes stated in her affidavit that she observed Plaintiff attempt to head-butt her.  The officers had some difficulty removing the leg restraints, but Sgt. Carlvin was eventually able to unlock the restraints and remove them.  It is noted that he had to use a flashlight in order to see the locks since the lights were not on in the cell.  The officers then backed out of the cell, and the cell door was closed.  The Court notes that the video clearly revealed that the officers never struck, punched nor kicked Plaintiff.  The force they employed consisted of placing him on the gurney, restraining him on the gurney, picking him up off of the gurney and placing him on the floor in his cell, and then holding him down while the leg restraints were removed.  After the officers left his cell, Plaintiff sat up, scooted to the cell door and placed his hands through the bean slot for the handcuffs to be removed.

Nurse Young attempted to conduct a cell-side physical examination of Plaintiff, but he refused to cooperate, so she had to resort to a visual examination of him.  She did not observe any injuries. Dr. Bower noted in his affidavit that Physician's Assistant Bennett subsequently saw Plaintiff and concluded that he did not have a need for crutches nor a leg brace.  Plaintiff was seen by Galveston Ortho on April 23, 2009, which again noted the problems with his knees.  There were no mention of any new injuries, such as a broken leg.

Defendants' legal arguments concerning these facts will be fully discussed in the Discussion and Analysis section of this opinion.

<u>Plaintiff's Response</u>

Plaintiff did not file a response.  He was warned that the failure to timely respond to a motion for summary judgment reflects a lack of due diligence in prosecuting the case and may result in the

dismissal of the lawsuit on that basis alone.  *See Martinez v. Johnson*, 104 F.3d 769 (5th Cir. 1997) (affirming dismissal for want of prosecution based on inmate's failure to respond to a summary judgment motion as ordered by the court).  Nonetheless, he failed to file a response.

## Discussion and Analysis

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party for summary judgment has the burden of proving the lack of a genuine dispute as to all the material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);  *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1221-23 (5th Cir. 1985).

In deciding a motion for summary judgment, the Court must make a threshold inquiry in determining whether there is a need for a trial.  "In other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  477 U.S. at 247-48.

If the movant satisfies its initial burden of demonstrating the absence of a material fact dispute, then the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact dispute concerning the essential elements of its case for which it will bear the burden of proof at trial.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The non-movant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199  (5th Cir.), *cert. denied*, 488

U.S. 926 (1988).  Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 324.  To carry this burden, the non-movant must present evidence sufficient to support a resolution of the factual disputes in his favor.  *Anderson*, 477 U.S. at 257.  The non-movant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment.  *See, e.g., Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).  All reasonable inferences are drawn in favor of the non-moving party, but the non-moving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'"  *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *Miller v. Graham*, 447 Fed. Appx. 549, 551 (5th Cir. 2011); *Chacon v. York*, 434 Fed. Appx. 330, 332 (5th Cir. 2011).

This case is rather unique because most of it was recorded on a DVD.  The Supreme Court dealt with the use of a videotape in conjunction with an excessive use of force claim in the context of summary judgment proceedings in *Scott v. Harris*, 550 U.S. 372 (2007).  While citing the rule in summary judgment proceedings that the facts must be viewed in the light most favorable to the nonmoving party, the Supreme Court also specified that a court should consider a videotape that discredits a Plaintiff's version of events.  *Id.* at 380-81.  The Supreme Court provided the following analysis:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment. . . .  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id.* The Fifth Circuit has accordingly held that a court need not rely on a plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

The lawsuit should initially be dismissed for want of prosecution since Plaintiff did not respond to the motion for summary judgment.

The lawsuit should also be dismissed based on the motion for summary judgment. The first claim addressed by the Defendants concerned Plaintiff's medical claim. Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

10

239 F.3d 752, 756 (5th Cir. 2001). A plaintiff does not have a basis for a meritorious civil rights lawsuit just because he was dissatisfied with the medical care provided to him. *Estelle v. Gamble*, 429 U.S. at 106; *Johnson v. Treen*, 759 F.2d at 1238.

Most recently, the Fifth Circuit affirmed the dismissal of another civil rights lawsuit filed by Plaintiff concerning the medical care provided for his knees in *Smith v. Williams,* No. 11-20051, 2012 WL 975058 (5th Cir. March 22, 2012). The Court provided the following analysis:

> Although the record reveals some possibly inaccurate assessments of Smith's knee problem, due largely to his failure to cooperate and the skepticism that it generated, the plethora of summary judgment evidence in the record establishes that, despite their skepticism, the medical defendants conscientiously examined and treated Smith. He offers only his own bald conclusions, refuted by the medical record, that these defendants refused to act to remedy his medical condition. Smith's complaint is, at best, a claim of negligence, malpractice, or mere disagreement about the course of treatment. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

*Id.* at *1.

In the present case, the undisputed competent summary judgment evidence shows that the medical defendants provided appropriate care and were not deliberately indifferent to Plaintiff's medical needs. Plaintiff was confined at the Beto Unit for less than a month while awaiting further testing and medical appointments for his knees. When Plaintiff became unruly while confined in the Beto Unit infirmary, Dr. Roe made the decision to discharge him from the infirmary. Dr. Roe explained that there was no medical reason to keep him there since he was merely waiting for further testing and medical appointments. The discharge plan was for Plaintiff to continue his medications as per current medical pass, await orthopedic disposition, and make sure that his orthopedic appointment for April 23, 2009, was kept, all of which could be accomplished in a cell. Dr. Roe also noted that he discharged Plaintiff due to his behavior. Plaintiff's actions in pounding on the windows could have caused further injury to Plaintiff, and the yelling, screaming and unruly behavior certainly

11

would have upset other inmate patients in the infirmary who needed rest and quietness for their medical condition or illness.  Dr. Roe expressed the opinion that the discharge plan to a cell was appropriate in that Plaintiff required no medical attention in an infirmary setting.  The competent summary judgment evidence does not show that Dr. Roe refused to treat Plaintiff, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  The competent summary judgment evidence viewed in a light most favorable to Plaintiff does not support an inference that Dr. Roe was deliberately indifferent to any serious medical needs.

The competent summary judgment evidence reveals that Nurse Steely had very little connection to the events of this case.  The undisputed evidence shows that she was working in the Beto Unit emergency room when Defendants McClendon and DePalma wheeled Plaintiff into the room. McClendon asked her where to take Plaintiff.  Steely told McClendon that Plaintiff did not have an appointment and to take him back to his cell.  Plaintiff responded by getting out of his wheelchair, sitting on the floor and creating a disturbance.  Steely complied with McClendon's request to call a supervisor.  She then left the area and saw nothing more of the incident.  The competent summary judgment evidence viewed in a light most favorable to Plaintiff does not support an inference that she refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Stated differently, she did not know about and disregard an excessive risk to Plaintiff's health or safety.  The competent summary judgment evidence does not support a claim of deliberate indifference against Nurse Steely.

Plaintiff also sued Nurse Young.  Her role in this matter was likewise very limited.  She observed McClendon bring Plaintiff into the emergency room.  She also observed Nurse Shirley Huff inform McClendon that Plaintiff did not have an appointment and that he needed to be returned to his cell.  She observed Plaintiff throwing himself onto the floor.  She conducted a visual examination of Plaintiff after he was strapped to the gurney and observed no visible injuries.  She also attempted to conduct a cell-side physical examination of Plaintiff.  He refused to cooperate, so she had to resort to a visual examination of him.  Physician's Assistant Bennett subsequently examined Plaintiff and the injuries he observed were not attributable to the incident on March 17, 2009.  Overall, Nurse Young did not observe any injuries.  She did not know about and disregard an excessive risk to Plaintiff's health or safety.  The competent summary judgment evidence does not support a claim of deliberate indifference against Nurse Young.

The next claim discussed by Defendants involved Plaintiff's excessive use of force claim.  The Supreme Court has emphasized that the core judicial inquiry in an Eighth Amendment excessive use of force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).   An excessive use of force claim has both subjective and objective components.  *Id.* at 8.  In other words, there is the issue of whether the officials acted with a "sufficiently culpable state of mind" and if the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.  *Id.*  A claimant must allege and prove there was an "unnecessary and wanton infliction of pain."  *Id.* at 5. In deciding whether the use of force was wanton or unnecessary, a court may consider "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a

forceful response." *Id.* at 7. (internal quotation and citation omitted).  The absence of a serious injury is relevant to but not dispositive of the excessive force claim.  *Id.*

As the undisputed facts, the DVD and the use of force report show, the force used on Plaintiff was applied in a good faith effort to maintain or restore discipline.  The undisputed evidence is that Plaintiff jumped off of the wheelchair and sat on the floor.  He created a disturbance.  He created a situation that gave rise to the need for application of force.  Supervisors were called and additional security personnel came on the scene.  An order was given to place Plaintiff on the gurney and transport him back to his cell.  The incident would have ended at that time if Plaintiff had complied.  Instead, he escalated the situation by kicking, struggling with the officers, biting at them and head-butting them.  The DVD clearly shows that the Defendants responded by calmly and simply transporting Plaintiff from the infirmary to his cell.  They did not strike, kick nor punch him.  The force they employed consisted of placing him on the gurney, restraining him on the gurney, picking him up off of the gurney and placing him on the floor in his cell, and then holding him down while the leg restraints were removed.  They made every effort to limit the severity of a forceful response.  Moreover, there is no indication that he sustained any injuries due to the use of force.  Defendants persuasively argued that Plaintiff has no evidence of the essential elements of an excessive use of force claim against them.  They are entitled to summary judgment on the excessive use of force claim.

Defendants went on to address a number of collateral issues that were arguably raised by Plaintiff's discussion of the facts.  Plaintiff complained about being placed in a dark cell, which caused him to fall and hurt his leg.  "To establish an Eighth Amendment claim, the prisoner must demonstrate, *inter alia*, an objective component of conditions so serious as to deprive him of the minimal measure of life's necessities, as when denied basic human need."  *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir.

14

1999).  Plaintiff's complaint about the dark cell did not rise to the level of a constitutional violation. It was clear on the DVD that the cell was dark, but it was also clear that there was light from the run/hallway.  The competent summary judgment evidence reveals that he was confined in the cell for no more than three days, and such confinement for that short period of time did not deprive him of the minimal measure of life's necessities.

Defendants also appropriately noted that the undisputed evidence shows that neither Dr. Roe nor Sgt. Olsen placed Plaintiff in a cell that they knew was unlit.  Dr. Roe had no role to play in the placement of Plaintiff in the specific cell.  Sgt. Olsen added that it was his practice to check to make sure the lights were on and to see that everything was clean and operable.  As with any Eight Amendment claim, Plaintiff must show that they knew of and disregarded an excessive risk to inmate health or safety.  Plaintiff failed to satisfy this requirement.  He failed to show that they were deliberately indifferent.  They are entitled to summary judgment on this claim.

Defendants also noted that Plaintiff made allegations of retaliation, which they characterized as vague and conclusory.  Plaintiff alleged that Dr. Roe and Sgt. Olsen retaliated against him by removing him from the infirmary.  To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999).  A plaintiff must show that the defendants possessed a retaliatory motive.  *See Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988); *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985).  He must show more than his personal belief that he was the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir.), *cert. denied*, 522 U.S. 995 (1997); *Jones v. Greninger*, 188 F.3d at 324-25.  Mere conclusory allegations

15

of retaliation are not enough.  *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988).  Moreover, he must

show that "but for" a retaliatory motive, the defendants would not have engaged in the action.  *Woods*

*v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996).

In the present case, Plaintiff was removed from the infirmary after he became very disruptive

by yelling and screaming and pounding on the windows of his room in the infirmary.  Such behavior

was not protected by the Constitution.  He did not show that actions were taken against him for

engaging in a specific constitutional right.  He also failed to show that Dr. Roe and Sgt. Olsen had a

retaliatory intent.  He finally failed to show that "but for" a retaliatory motive, he would not have been

removed from the infirmary.  The retaliation claim is conclusory and devoid of merit.  Defendants are

entitled to summary judgment based on the retaliation claim.

Plaintiff also made vague allegations based on the Americans with Disabilities Act ("ADA").

Congress enacted the ADA to establish a "comprehensive national mandate for the elimination of

discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  *See also Meyers v.*

*Texas*, 410 F.3d 236, 239 (5th Cir. 2005).  The Supreme Court fully explained the purpose of Title II

of the ADA as follows:

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of
> such disability, be excluded from participation in or be denied the benefits of the services,
> programs, or activities of a public entity, or be subjected to discrimination by any such entity."
> § 12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual
> with a disability who, with or without reasonable modifications to rules, policies, or practices,
> the removal of architectural, communication, or transportation barriers, or the provision of
> auxiliary aids and services, meets the essential eligibility requirements for the receipt of
> services or the participation in programs or activities provided by a public entity." § 12131(2).
> The Act defines "'public entity'" to include "any State or local government" and "any
> department, agency, ... or other instrumentality of a State," § 12131(1). We have previously
> held that this term includes state prisons. See *Pennsylvania Dept. of Corrections v. Yeskey,* 524
> U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Title II authorizes suits by private
> citizens for money damages against public entities that violate § 12132. See 42 U.S.C. § 12133
> (incorporating by reference 29 U.S.C. § 794a).

16

*United States v. Georgia*, 546 U.S. 151, 153-54 (2006).   A State "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program."   *See Olmstead v. Zimring*, 537 U.S. 581, 606 n.16 (1999).   Defendants, sued individually, are not proper parties for an ADA claim.   *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999).   Defendants appropriately noted that Plaintiff's ADA claims against the individuals named in *Smith v. Williams* were dismissed because they lacked merit.   On appeal, the Fifth Circuit found that Plaintiff "failed to state a plausible or coherent claim for violation of the Americans with Disabilities Act."   *Smith v. Williams*, 2012 WL 975058 at *1.   The Fifth Circuit's findings are equally applicable to the present case.   Defendants are entitled to summary judgment on the ADA claims.

Finally, Defendants argued that they are entitled to summary judgment based on qualified immunity.   The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009).   Government employees are presumptively entitled to the defense of qualified immunity.   Once asserted, the burden shifts to a plaintiff to demonstrate that qualified immunity does not bar their recovery.   *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).   A two-step process has traditionally been employed in evaluating the defense of qualified immunity.   *Saucier v. Katz*, 533 U.S. 194 (2001).   Under the traditional approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right."   *Id.* at 201.   Second, if the plaintiff has satisfied the first step, courts are required

to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  *Id.  See also Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011).  "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted).  The Fifth Circuit has specified that the issue for a court's consideration with respect to the second step is whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.  *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011) (citations omitted).  Conclusory allegations of wrong-doing fail to satisfy both the first and second requirement.  *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988).  More recently, the Supreme Court held that a case may be dismissed based on either step in the qualified immunity analysis: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009);  *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011).

In the present case, Plaintiff did not satisfy the first step in the qualified immunity analysis. He did not show that any of the Defendants violated his constitutional rights.  Defendants are entitled to summary judgment based on qualified immunity for that reason alone.  Plaintiff also failed to address the second step.  He failed to show that any of the Defendants engaged in objectively unreasonable actions in light of clearly established law.  He failed to satisfy his burden in order to defeat a motion for summary judgment based on qualified immunity.  Consequently, Defendants are

entitled to summary judgment based on either step in the qualified immunity analysis.   It is accordingly

      **ORDERED** that Defendants' motion for summary judgment (docket entry #208) is **GRANTED** and the complaint is **DISMISSED** with prejudice.  It is further

      **ORDERED** that all motions not previously ruled on are **DENIED**.

    So **ORDERED** and **SIGNED** this 25 day of June, 2012.

 

                                    _____

                                  JUDITH K. GUTHRIE

                                  UNITED STATES MAGISTRATE JUDGE